# EXHIBIT A

LEXSEE 2005 U.S. DIST. LEXIS 17195

**JARALLAH AL-MARRI, et al., Petitioners, v. GEORGE W. BUSH, et al., Respondents.**

Civil Action No. 04-2035 (GK)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2005 U.S. Dist. LEXIS 17195*

**March 7, 2005, Decided**
**March 7, 2005, Filed**

**SUBSEQUENT HISTORY:** Injunction granted at, Motion denied by *Al-Marri v. Bush, 2005 U.S. Dist. LEXIS 6259 (D.D.C., Apr. 4, 2005)*

**COUNSEL:** [*1] For JARALLAH AL-MARRI, Detainee, Guatanamo Bay Naval Base, ALI SALAH KAHLAH AL-MARRI, Petitioners: Jonathan L. Hafetz, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, New York, NY; Lawrence S. Lustberg, Mark A. Berman, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, Newark, NJ.

For GEORGE W. BUSH, President of the United States, DONALD RUMSFELD, Secretary of Defense, JAY HOOD, Army Brigadier General, all sued in their official capacities, Respondents: Terry Marcus Henry, U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION, Washington, DC; Preeya M. Noronha, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

**JUDGES:** Gladys Kessler, United States District Judge.

**OPINIONBY:** Gladys Kessler

**OPINION:**

**ORDER**

On January 10, 2005, Petitioners filed a Motion for Discovery and for Preservation Order. Petitioners request that the Court order Respondents to preserve and main-

tain all evidence and information regarding the torture, mistreatment, and abuse of detainees at Guantanamo Bay. Respondents, however, argue that Petitioners have failed to satisfy the standard for entering a preliminary injunction, which is required when considering a request for a preservation order.

"[A] document preservation order is [*2] no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." *Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 138 n.8 (Fed. Cl. 2004)* (citing *Mercer v. Magnant, 40 F.3d 893, 896 (7th Cir. 1994))*. Thus, Petitioners need not meet such a standard when seeking a preservation order. Furthermore, Respondents represent that the information at issue will not be destroyed, so the Court finds that entering a preservation order will inflict no harm or prejudice upon them. Accordingly, it is hereby

**ORDERED** that Petitioners' Motion for Preservation Order is **granted;** it is further

**ORDERED** that Respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility.

March 7, 2005

Gladys Kessler

United States District Judge

# EXHIBIT B

LEXSEE 2005 U.S. DIST. LEXIS 17189

**MAHMOAD ABDAH, et al., Petitioners, v. GEORGE W. BUSH, et al., Respondents.**

**Civil Action 04-1254 (HHK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2005 U.S. Dist. LEXIS 17189*

**June 10, 2005, Decided**
**June 10, 2005, Filed**

**SUBSEQUENT HISTORY:** Motion granted by *Khaled A.F. Al Odah v. United States, 2005 U.S. App. LEXIS 14581 (D.C. Cir., July 18, 2005)*

**PRIOR HISTORY:** *Abdah v. Bush, 2005 U.S. Dist. LEXIS 4942 (D.D.C., Mar. 29, 2005)*

**COUNSEL:** [*1] For MAHMOAD ABDAH, Detainee, Camp Delta, MAHMOAD ABDAH AHMED, as next friend of Mahmoad Abdah also known as MAHMOOD ABDO AHMED BIN AHMED, MAJID MAHMOUD AHMED, Detainee, Camp Delta also known as MAJED MOHMOOD also known as MAJID M. ABDU AHMED, MAHMOUD AHMED, as next friend of Majid Abdah Ahmed, ABDULMALIK ABDULWAHHAB AL-RAHABI, Detainee, Camp Delta, AHMED ABDULWAHHAB, as next friend of Abdulmalik Abdulwahhab Al-Rahabi, MAKHTAR YAHIA NA JI AL-WRAFIE, Detainee, Camp Delta, FOADE YAHIA NAJI AL-WRAFIE, as next friend of Makhtar Yahia Naji Al-Wrafie, AREF ABD IL RHEEM, Detainee, Camp Delta, AREF ABD AL RAHIM, as next friend of Aref Abd Il Rheem, YASEIN KHASEM MOHAMMAD ESMAIL, Detainee, Camp Delta, JAMEL KHASEM MOHAMMAD, as next friend of Yasein Khasem Mohammad Esmail, ADNAN FARHAN ABDUL LATIF, Detainee, Camp Delta, MOHAMED FARHAN ABDUL LATIF, as next friend of Adnan Farhan Abdul Latif, JAMAL MAR'I, Detainee, Camp Delta, NABIL MOHAMED MAR'I, as next friend of Jamal Mar'i, OTHMAN ABDULRAHEEM MOHAMMAD, Detainee, Camp Delta, ARAF ABDULRAHEEM MOHAMMAD, as next friend Othman Abdulraheem Mohammad, ADIL EL HAJ OBAID, Detainee, Camp Delta, NAZEM SAEED EL HAJ OBAID, as next friend of Adil Saeed El [*2] Haj Obaid, MOHAMED MOHAMED HASSAN ODAINI, Detainee, Camp Delta, BASHIR MOHAMED HASSAN ODAINI, as next friend of Mohamed Mohamed Hassan Odaini, SADEQ MOHAMMED SAID, Detainee, Camp Delta, ABD ALSALAM MOHAMMED SAEED, as next friend of Sadeq Mohammed Said, FAROUK ALI AHMED SAIF, Detainee, Camp Delta, SHEAB AL MOHAMEDI, as next friend of Farouk Ali Ahmed Saif, SALMAN YAHALDI HSAN MOHAMMED SAUD, Detainee, Camp Delta, YAHIVA HSANE MOHAMMED SAUD AL-RBUAYE, as next friend of Salman Yahaldi Hsan Mohammed Saud, Petitioners: David H. Remes, Marc D. Falkoff, COVINGTON & BURLING, Washington, DC.

For GEORGE W. BUSH, JR., President of the United States, DONALD RUMSFELD, Secretary, United States Department of Defense, JAY HOOD, Army Brig. Gen. Commander, Joint Task Force-GTMO, NELSON J. CANNON, Army Col., Commander, Camp Delta, all respondents are sued in their official and personal capacities, Respondents: Lisa Ann Olson, Preeya M. Noronha, Robert J. Katerberg, U.S. DEPARTMENT OF JUSTICE, Washington, DC; Terry Marcus Henry, U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION, Washington, DC.

For CHARLES B. GITTINGS, JR., Amicus: Pro se, Manson, WA; Charles B. Gittings, Jr., Manson, WA.

**JUDGES:** Henry H. [*3] Kennedy, Jr., United States District Judge.

**OPINIONBY:** Henry H. Kennedy, Jr.

**OPINION:**

### ORDER

On January 10, 2005, petitioners filed a Motion for Leave to Take Discovery and For Preservation Order [# 96]. On February 3, 2005, the court (Green, J.) ordered that the proceedings in this and ten other coordinated

cases be "stayed for all purposes pending resolution of all appeals in this matter." To the extent that petitioners seek to take discovery, their motion must be stayed in accordance with Judge Green's order.

Petitioners also seek a preservation order, which they argue is necessary to ensure that the government will maintain "the very sensitive evidence it now possesses about the torture, mistreatment, and abuse of the detainees now at Guantanamo." Pet'rs' Mot. for Disc./Protective Order at 8-9. Respondents counter that petitioners have failed to satisfy the four-part preliminary injunction standard, which they assert is required for entry of a protective order; that petitioners have not identified specific documents at risk for destruction; and that respondents are "well aware of their obligation not to destroy evidence that may be relevant in pending litigation." Resp'ts' Opp'n [*4] at 25.

While preservation orders take the form of an injunction, in that they order a party to perform or refrain from performing an act, petitioners need not meet the four-part preliminary injunction test in order to protect relevant documents from destruction. In fact, "a document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." *Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 138 n.8 (Fed. Cl. 2004)* (citing *Mercer v. Magnant, 40 F.3d 893, 896 (7th Cir. 1994))*; see also *Ditlow v. Shultz, 170 U.S. App. D.C. 352, 517 F.2d 166, 173-74, n.31 (D.C. Cir. 1975)* (preservation order issued when moving party presented "sufficiently substantial" challenge on the merits, nonmoving party agreed to maintain documents at issue, and

preservation of documents presented only a "limited housekeeping burden").

Furthermore, in this case, all of the documents relevant to the adjudication of petitioners' claims, along with petitioner-detainees themselves, are in the sole custody and control of respondents. In addition, petitioners' counsel's access to their clients is quite restricted. [*5] It is almost inconceivable that within these confines, petitioners could identify specific instances of document destruction. Rather, the court finds entry of a preservation order appropriate in light of the purpose animating Judge Green's February 3, 2005 stay order, namely to preserve the status quo pending resolution of appeals. Finally, because respondents represent that they will not destroy the information at issue, a preservation order will not impose any harm or prejudice upon them. See *Al-Marri v. Bush, 2005 U.S. Dist. LEXIS 17195, No. 04-2035 (D.D.C. March 7, 2005)* (preservation order). Accordingly, it is this 10th day of June, 2005 hereby

**ORDERED**, that petitioners' motion is **STAYED** insofar as petitioners seek discovery and **GRANTED** insofar as they seek a preservation order; and it is further

**ORDERED**, that respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the United States Naval Base at Guantanamo Bay, Cuba.

June 10, 2005

Henry H. Kennedy, Jr.

United States District Judge

# EXHIBIT C

Case 1:05-cv-00490-PLF    Document 14    Filed 03/23/2005    Page 1 of 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                          )
ADBUL-SALAM GAITHAN                        )
   MUREEF AL-SHIRY, et al.,                )
                                          )
            Petitioners,                   )
                                          )
       v.                                  )         Civil Action No. 05-0490 (PLF)
                                          )
GEORGE W. BUSH, et al.,                    )
                                          )
            Respondents.                   )
                                          )
```

<u>ORDER</u>

This matter is before the Court on petitioner's motion for entry of a preservation

order and respondents' motion to stay this case pending resolution of all appeals in cases filed by

other detainees at the United States Naval Base in Guantanamo Bay, Cuba.  Upon consideration

of the arguments of the parties and the full record in this case, it is hereby

ORDERED that [6] petitioner's Motion for Preservation Order is GRANTED.

Respondents shall preserve and maintain all evidence and information regarding the torture,

mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility, or otherwise

within Respondents' possession, custody or control; it is

FURTHER ORDERED that The Amended Protective Order and Procedures for

Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first

issued on November 8, 2004; the Order Addressing Designation Procedures for "Protected

Information" entered on November 10, 2004; and the Order Supplementing and Amending Filing

Procedures Contained in November 8, 2004 Amended Protective Order, issued on December 13,

2004, in the <u>In re Guantanamo Bay Detainee Cases</u>, Civil No. 02-0299, <u>et al.</u>, by Judge Joyce

Hens Green shall apply in this case; and it is

          FURTHER ORDERED that [4] respondents' Motion to Stay Proceedings Pending

Related Appeals and for Continued Coordination is GRANTED.  This case is STAYED pending

resolution of all appeals in <u>In re Guantanamo Detainee Cases</u>, Civil No. 02-0299, <u>et al.</u>, 2005 WL

195356 (D.D.C. Jan. 31, 2005), and <u>Khalid et al. v. Bush</u>, Civil No. 04-1142, 2005 WL 100924

(D.D.C. Jan. 19, 2005).  This stay shall not, however, prevent the parties from continuing to avail

themselves of the procedures set forth in the Protective Order, nor shall it bar the filing or

disposition of any motion for emergency relief, including petitioner's pending motion for

preliminary injunction.

          SO ORDERED.


                    /s/_____
                    PAUL L. FRIEDMAN
                    United States District Judge

DATE: March 23, 2005

2

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELHAM BATTAYAV, <u>et al.</u>,     ) | |
|     ) | |
| Petitioners,     ) | |
|     ) | |
| v.     ) | Civil Action No: 05-714 (RBW) |
|     ) | |
| GEORGE WALKER BUSH, <u>et al.</u>,     ) | |
|     ) | |
| Respondents.     ) | |

### <u>ORDER</u>

Currently before the Court is the Respondents' Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination ("Resp. Mot."); the Petitioners' Opposition to Respondents' Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination ("Pet. Opp'n"); and the Respondents' Reply Memorandum in Support of Motion to Stay Proceedings Pending Related Appeals and for Continued Coordination ("Resp. Reply").

In their motion, the respondents argue that this case should be stayed pending the resolution of all appeals in <u>Hamdan v. Rumsfeld</u>, 344 F. Supp. 2d 152, 165 (D.D.C. 2004); <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp. 2d 443 (D.D.C. 2005); <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005); and <u>Boumediene v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005). Specifically, the respondents' contend that "[t]he oucome of the appeals will determine how all of the Guantanamo detainee cases should proceed, if at all." Resp. Mot. at 8. The petitioners, however, argue that the case should not be stayed due to the importance and priority of habeas petitions. Pet. Opp'n at 3. Nevertheless, the petitioners posit that should this Court grant the

1

respondents' motion, the Court should (1) require the respondents to produce factual returns for each petitioner; (2) require the respondents to collect and preserve all documents relating to the petitioners and detainee abuse at Guantanamo Bay; (3) require the respondents to provide the petitioners and their counsel with sixty days' notice of any Administrative Review Board ("ARB") proceeding; and (4) exclude from the stay the petitioners' claims for declaratory and injunctive relief.[1]   Pet. Opp'n at 2.  Both parties request that this Court enter an order adopting the protective orders as entered and modified by Judge Green in the consolidated cases that were before her.  Resp. Mot. at 10; Pet. Opp'n at 15.

After a careful review of the papers submitted by the parties, it is apparant that the resolution of the appeals in the aforementioned cases will directly address many of the legal issues raised in the current petition, including some of the civil claims for injunctive and declaratory relief.  In fact, the outcome of these appeals will determine how all of the Guantanamo detainee cases should proceed and will likely provide guidance on petitioners' claims based on the Fifth Amendment, the Geneva Conventions, various provisions of international law, the Alien Tort Statute, 28 U.S.C. § 1350, and the Administrative Procedure Act, 5 U.S.C. § 706.  Accordingly, this Court must conclude that all proceedings in this case should be stayed, including any and all matters related to civil claims for injunctive and declaratory relief.  Such a stay is in the interest of judicial economy and avoids unnecessary litigation.[2]

---

[1]   The petitioners also request that this Court exclude from any stay the petitioners' motion for a preliminary injunction. Because this Court has already ruled on the petitioners' preliminary injunction motion, this request is moot. See May 3, 2005 Order (denying motion for preliminary injunction).

[2]   Many other judges of this Court, when presented with a similar question, have ordered stays. See, e.g.,

(continued...)

Turning now to the petitioners' remaining alternative arguments, they suggest that if the respondents' motion is granted, the Court should order the respondents to produce factual returns; require the respondents to collect and preserve all documents relating to the petitioners and the abuse of detainees at Guantanamo Bay; and require the respondents to provide the petitioners and their counsel with sixty days' notice of any ARB proceedings. Pet. Opp'n at 2.

The respondents contend that "it makes no sense for the government to process and submit factual returns with respect to . . . the petitions . . . when the [District of Columbia] Circuit will be considering the proper scope of these habeas proceedings, including whether the claims of [the] petitioners can be dismissed without reference to specific factual returns for petitioners." Resp. Mot. at 11-12. In addition, the respondents argue that the submission of factual returns is extremely burdensome and "risks the inadvertent disclosure of classified information." Id. at 12. When presented with a similar issue, another member of this Court noted that "[a]lthough the Court is sensitive to the concerns of respondents, the factual returns appear necessary for petitioners' counsel effectively to represent petitioners. Indeed, even initial conversations by counsel with their clients may be very difficult without access to that basic factual information." Al-Anazi v. Bush, 2005 WL 1119602, at *10 (D.D.C. April 21, 2005). This Court agrees, and must conclude that the government should produce factual returns for the petitioners in this case.

The petitioners' remaining requests—entry of orders requiring the respondents to collect and preserve documents and to provide the petitioners and their counsel with at least sixty days

---

[2](...continued)
Resp. Reply at 4 (cases cited therein).

notice of any ARB proceeding so that counsel for the petitioners can assist them in coordinating

their submissions—are not properly before the Court. First, "[a] motion to preserve evidence is

an injunctive remedy and should issue only upon an adequate showing that equitable relief is

warranted." Madden v. Wyeth, 2003 WL 21443404, at *1 (N.D. Tex. Apr. 16, 2003) (citing

Pepsi-Cola Bottling Co. of Olean v. Cargill, Inc., 1995 WL 783610, at *3-4 (D. Minn. Oct. 20,

1995); Humble Oil & Refining Co. v. Harang, 262 F. Supp. 39, 42-43 (E.D. La. 1966)). In this

case, the petitioners simply make a request to preserve documents, but fail to make any showing

that the equitable relief they seek is warranted. Pet. Opp'n at 13. In fact, the respondents clearly

state for the record that they "are well aware of their obligation not to destroy evidence that may

be relevant in pending litigation." Resp. Reply at 12. Moreover, another member of this Court

has recently issued an Order requiring the preservation of "all evidence and information

regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention

facility." Al-Marri v. Bush, No. 04-2035, at 1-2 (D.D.C. March 7, 2005). This order requires the

preservation of all documents relating to detainee abuse, not just the retention of documents

relating to the petitioners in that case, thus the respondents are already under an obligation to

preserve relevant documents. Accordingly, the Court will deny this request.

   The Court must also deny the petitioners' request for an order mandating that the

petitioners and their counsel be provided at least sixty days notice of any ARB proceeding so that

counsel for the petitioners can assist them in coordinating their submissions. Resp. Opp'n at 13-

14. Again, the petitioners simply make this request, but fail to provide any legal support for it.

In fact, it appears to the Court that this request is in effect a motion for a preliminary injunction,

similar in nature to one previously denied by this Court. See May 3, 2005 Order. However, the

4

petitioners make no attempt to show that they satisfy the criteria for obtaining injunctive releif,

e.g., irreparable harm and likelihood of success on the merits.  In fact, in light of this Court's

holding in Almurbati v. Bush, 2005 WL 851934 (D.D.C. Apr. 14, 2005), this Court questions

whether it can require the Executive branch to provide such notice to the petitioners and their

counsel.  Moreover, two members of this Court have concluded that the petitioners do not have a

Sixth Amendment right to counsel, see In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443,

480 (D.D.C. 2005) (rejecting petitioners Sixth Amendment right to counsel); Khalid, 355 F.

Supp. 2d 311, 323 (D.D.C. 2005) (rejecting all of petitioners' constitutional claims, including his

right to counsel claim), thus, no purpose would be served by requiring advance notice of such

proceedings to counsel.  Khalid, 355 F. Supp. 2d at 323.  Because the petitioners have failed to

provide this Court with any legal authority to justify this request, it must be denied.

Accordingly, it is hereby this 18th day of May, 2005

**ORDERED** that the Amended Protective Order and Procedures for Counsel Access to

Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November

8, 2004 in In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. 2004), the Order

Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended

Protective Order, first issued on December 13, 2004 in In re Guantanamo Detainee Cases, and

the Order Addressing Designation Procedures for "Protected Information," first issued on

November 10, 2004 in In re Guantanamo Detainee Cases, shall also apply to this case.  It is

further

**ORDERED** that the respondents' motion to stay is **GRANTED**.  It is further

**ORDERED** that the respondents shall produce factual returns for each petitioner in this

case within 120 days of the entry of this Order.  It is further

ORDERED that the petitioners' requests: (1) to require the respondents to collect and preserve all documents relating to the petitioners and detainee abuse at Guantanamo Bay; (2) to require the respondents to provide the petitioners and his counsel with sixty days' notice of any Administrative Review Board ("ARB") proceeding; and (3) to exclude from the stay the Petitioners' claims for declaratory and injunctive relief are DENIED.  It is further

ORDERED that the petitioners' request that this Court exclude from any stay the petitioners' motion for a preliminary injunction is DENIED AS MOOT.

SO ORDERED.


REGGIE B. WALTON
United States District Judge

6

# EXHIBIT E

Westlaw.

Slip Copy

Page 1

Slip Copy, 2005 WL 1903561 (D.D.C.)
**(Cite as: Slip Copy)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Jamil EL-BANNA et al., Petitioners,
v.
George W. BUSH et al., Respondents.
HANI SALEH RASHID ABDULLAH et al.,
Petitioners,
v.
George W. BUSH et al., Respondents.
**No. Civ.A. 04-1144(RWR), Civ.A. 05-23(RWR).**

July 18, 2005.

George Brent Mickum, IV, Douglas James Behr, Keller & Heckman, LLP, Stephen M. Truitt, Charles Henry Carpenter, Pepper Hamilton LLP, Washington, DC, for Petitioners.
Andrew I. Warden, Lisa Ann Olson, Preeya M. Noronha, Robert J. Katerberg, Terry Marcus Henry, U.S. Department of Justice, Washington, DC, for Respondents.

MEMORANDUM OPINION AND ORDER

ROBERTS, J.
**\*1** Petitioners in each of the above-captioned habeas corpus proceedings-foreign nationals detained at Guantanamo Bay in the custody of the United States, or their next friends-seek an order directing respondents to "preserve and maintain all evidence, documents, and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility, and to preserve and maintain all evidence, documents and information relating or referring to Petitioners." (Mot. for Preservation Order.) [FN1] Respondents oppose each motion, arguing that the requested order is superfluous in light of their well-understood preservation obligations, yet also overbroad and burdensome. (Opp'n at 5, 7.) [FN2] Because a preservation order can be appropriate in a habeas

corpus proceeding, but is only partially warranted here, petitioners' motions will be granted in part and denied in part.

> FN1. *El-Banna,* Dkt. 145; *Abdullah,* Dkt. 30.

> FN2. *El-Banna,* Dkt. 147; *Abdullah,* Dkt. 32.

Respondents argue that because they are well aware of their preservation obligations, to " 'supplement every complaint with an order requiring compliance with the Rules of Civil Procedure would be a superfluous and wasteful task, and would likely create no more incentive upon the parties than already exists.' " (Opp'n at 5, quoting *Hester v. Bayer Corp.,* 206 F.R.D. 683, 685 (M.D.Ala.2001) ). [FN3] Respondents then conclude that petitioners' requested order is both "overbroad and potentially burdensome to the extent that it goes beyond what might otherwise be permissible with respect to any discovery that might ever be appropriate in a habeas case." (Opp'n at 7, citing *Harris v. Nelson,* 394 U.S. 296, 300 (1969).)

> FN3. The parties advocate different standards for preservation orders, a dispute that need not be resolved here. First, the distinction between the standard articulated in *Pueblo of Laguna v. United States,* 60 Fed. Cl. 133 (2004), urged by petitioners, and the standard four-factor test employed in preliminary injunction decisions, urged by respondents (*see* Opp'n at 3), may be one without a practical difference. *See also, Hester,* 206 F.R.D. at 685. Second, respondents argue that a preservation order must meet the test of a preliminary injunction (Opp'n at 3), but also concede that the Federal Rules of Civil Procedure impose preservation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2

Slip Copy, 2005 WL 1903561 (D.D.C.)
**(Cite as: Slip Copy)**

obligations on civil litigants in every civil action filed, automatically and without court review (Opp'n at 5), two positions in tension with each other.

The Supreme Court's opinion in *Harris v. Nelson* makes clear that the discovery provisions of the Federal Rules of Civil Procedure do not automatically apply in whole to federal habeas corpus proceedings. *See* 394 U.S. at 294 n. 5, 298-99. Therefore, the preservation obligations that flow to a litigant from the federal discovery rules cannot be presumed to apply to habeas litigants absent some express application by a court. Accordingly, a preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary.

Further, *Harris v. Nelson* also makes clear that a district court's authority to issue orders pursuant to 28 U.S.C. § 1651 in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition.

[The Supreme Court has] held explicitly that the purpose and function of the All Writs Act to supply the courts with the instruments needed to perform their duty [to issue orders appropriate to assist them in conducting factual inquiries] ... extend to habeas corpus proceedings.

At any time in the [habeas corpus] proceedings, when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly " dispose of the matter as law and justice require," either on its own motion or upon cause shown by the petitioner, it may issue such writs and take or authorize such proceedings with respect to development, before or in conjunction with the hearing of the facts relevant to the claims advanced by the parties, as may be "necessary or appropriate in aid of [its jurisdiction] ... and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

**\*2** ... Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate,

whether these are found in the civil or criminal rules or elsewhere in the "usages and principles of law."

394 U.S. at 299-300 (footnote omitted). The opinion in *Harris v. Nelson* does not support respondents' suggestion that the requested preservation order "goes beyond ... any discovery that might ever be appropriate in a habeas case." (Opp'n at 7.) [FN4] To the contrary, "the power of inquiry on federal habeas corpus is plenary" and its exercise depends entirely on the circumstances. *Harris v. Nelson,* 394 U.S. at 291.

> FN4. Respondents' statement, that " Petitioners' proposal improperly, and without good cause, would put respondents in the position of having to take action with respect to a wide range of documents without having the opportunity to utilize the process of objection and litigation available in the discovery context to fine tune or challenge discovery requested based on, for example, overbreadth, relevance, or burden" (Opp'n at 7), mistakenly equates preservation obligations with production obligations and erroneously presumes that respondents will have no opportunity to litigate future discovery requests.

Petitioners' filings challenge the fact and duration of their custody as being in violation of the Constitution or laws or treaties of the United States, matters that are cognizable under the general habeas statute. *See Rasul v. Bush,* 542 U.S. 466, 124 S.Ct. 2686, 2698, 159 L.Ed.2d 548 (2005) (" § 2241 confers ... jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base"); *Chatman-Bey v. Thornburgh,* 864 F.2d 804, 807 (D.C.Cir.1988) (a prisoner's challenge to the date on which he was eligible to be considered for parole "falls comfortably within the broad reach of habeas corpus"). The petitions also raise other complaints for which habeas relief has not been foreclosed, namely, that certain conditions they face in detention constitute violations of specific provisions of the Constitution, laws or treaties of the United

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 3

**Slip Copy, 2005 WL 1903561 (D.D.C.)**
**(Cite as: Slip Copy)**

States. *See Preiser v. Rodriguez,* 411 U.S. 475, 499, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("When a [state] prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal.") (citation omitted); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (removing restraint on the habeas corpus petitioner's ability to assist fellow prisoners in writ-writing). The preservation order requested is tailored to preserve "documents and information in ... [respondents'] possession" that may be "relevant to litigation or potential litigation or are reasonably calculated to lead to the discovery of admissible evidence." *Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984). Documents evidencing treatment of detainees-whether statements of official policy, cumulative evidence of specific practices, or something else-may be probative of the treatment of petitioners or may lead to other probative evidence. The requested order imposes no greater obligation on respondents than the federal discovery rules' preservation obligations impose on a litigant in a typical civil lawsuit. Respondents' contrary view of the requested order (Opp'n at 7) may underscore the need for a preservation order.

However, since the very preservation order sought by petitioners for all materials regarding treatment of all Guantanamo Bay detainees has already been issued against the same respondents in *Al-Marri v. Bush,* Civ. No. 04-2035 (D.D.C. Mar. 7, 2005) (Order), and *Abdah v. Bush,* Civ. No. 04-1254 (D.D.C. June 10, 2005) (Order), respondents here are already under a duty to preserve those records and another preservation order would be unnecessary. Accordingly, it is hereby

**\*3** ORDERED that petitioners' motions, insofar as they seek preservation orders governing evidence, documents, and information regarding the torture, mistreatment and/or abuse of detainees held at the Guantanamo Bay detention facility be, and hereby are, DENIED without prejudice as moot. It is further

ORDERED that petitioners' motions otherwise be, and hereby are, GRANTED. Respondents shall preserve and maintain all evidence, documents and

information, without limitation, now or ever in respondents' possession, custody or control, regarding the individual detained petitioners in these cases.

D.D.C.,2005.
El-Banna v. Bush
Slip Copy, 2005 WL 1903561 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:05cv00023 (Docket) (Jan. 07, 2005)
• 1:04cv01144 (Docket) (Jul. 06, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Case 1:05-cv-00020-RMB    ...    Page 1 of 7    **Exhibit 5**

A MILITARY INTELLIGENCE SOLDIER'S
EYEWITNESS ACCOUNT
OF LIFE AT GUANTÁNAMO

# INSIDE THE WIRE

## ERIK SAAR
### AND VIVECA NOVAK

# INSIDE THE WIRE

## A MILITARY INTELLIGENCE SOLDIER'S EYEWITNESS

## ACCOUNT OF LIFE AT GUANTÁNAMO

# ERIK SAAR

## AND VIVECA NOVAK

THE PENGUIN PRESS

NEW YORK

2005

THE PENGUIN PRESS
Published by the Penguin Group
Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014, U.S.A.   Penguin Group
(Canada), 10 Alcorn Avenue, Toronto, Ontario, Canada M4V 3B2 (a division of Pearson Penguin
Canada Inc.)   Penguin Books Ltd, 80 Strand, London WC2R 0RL, England   Penguin Ireland,
25 St. Stephen's Green, Dublin 2, Ireland (a division of Penguin Books Ltd)   Penguin Books
Australia Ltd, 250 Camberwell Road, Camberwell, Victoria 3124, Australia (a division of Pearson
Australia Group Pty Ltd)   Penguin Books India Pvt Ltd, 11 Community Centre, Panchsheel Park,
New Delhi – 110 017, India   Penguin Group (NZ), Cnr Airborne and Rosedale Roads,
Albany, Auckland 1310, New Zealand (a division of Pearson New Zealand
Ltd)   Penguin Books (South Africa) (Pty) Ltd, 24 Sturdee Avenue,
Rosebank, Johannesburg 2196, South Africa

Penguin Books Ltd, Registered Offices:
80 Strand, London WC2R 0RL, England

First published in 2005 by The Penguin Press,
a member of Penguin Group (USA) Inc.

1   3   5   7   9   10   8   6   4   2

Copyright © Erik Saar and Viveca Novak, 2005
All rights reserved

CIP data available.
ISBN 1-59420-066-1

This book is printed on acid-free paper. ⊖

Printed in the United States of America

Designed by Claire Vaccaro
Map by Jeffrey L. Ward

Without limiting the rights under copyright reserved above, no part of this publication may be repro-
duced, stored in or introduced into a retrieval system, or transmitted, in any form or by any means
(electronic, mechanical, photocopying, recording or otherwise), without the prior written permission
of both the copyright owner and the above publisher of this book.
    The scanning, uploading and distribution of this book via the Internet or via any other means
without the permission of the publisher is illegal and punishable by law. Please purchase only author-
ized electronic editions and do not participate in or encourage electronic piracy of copyrightable ma-
terials. Your support of the author's rights is appreciated.

I'd once heard a captive say, "so I can spend some time in the other cells."

The MPs clearly resented that they had so little control over detainee treatment. That was in the hands of the interrogators, though over time the MPs found their own ways to assert power. If an interrogator didn't want a detainee punished, it couldn't happen—end of story. The intelligence side viewed the detainees as potential information assets, from whom even one little revelation might help piece together a puzzle. The MPs just thought the detainees were treated too well; they were terrorists, responsible for 9/11, and their lives should be miserable. When I reported to a guard one day in my first couple of weeks that a detainee claimed his interrogator had promised him an additional blanket, the MP spit back at me, "I don't give a shit what some interrogator says. They're the ones screwing up this mission."

The guards did have one weapon in their small arsenal. If a detainee was adamantly resisting a command, they could go to their nuclear option and summon a squad of five MPs—called an IRF team, for Initial Reaction Force—which would subdue the captive with brute strength. Though I hadn't seen one in action, I'd heard they were highly effective and quite something to witness.

The MPs were on their best behavior when the International Committee of the Red Cross was paying one of its periodic visits. They, as well as the linguists, weren't supposed to talk to the Red Cross representatives unless absolutely necessary. The leadership was very wary of them, telling us to watch what we said when we went by the organization's

from the Koran. "Come on in." We told the guard commander
that the Brit seemed intent on being our first genuine holdout.
We knew the MPs might call in an IRF. I still hadn't seen one
in action.

The guard commander came to talk to the detainee himself.
He tried everything in the book. Mo stopped by the cellblock
to see if having a native linguist in the mix helped. Not this
time.

    The commander radioed the IRF team leader and told him
to start moving in. Before I saw anything, I heard a detainee
in the end cell shout, "Allah al-Akbar." God is great, the com-
mon cry when the shit was hitting the fan. Then loud, syn-
chronized stomping as five soldiers entered the block in
helmets, over-the-knee shin pads, chest protectors, and thick
black-leather gloves. The first soldier in line carried a clear
plexiglass shield. They walked in step, each hanging on to the
waist of the soldier in front of him. It was like a scene from
some storm trooper action film. They were in no rush; the psy-
chological effect of their march down the corridor, boots echo-
ing off the metal floor with frightening, deafening thuds, was
powerful. One NCO was following the group with a video
camera. I was told the tapes were used for training.

    The detainee very slowly kissed his Koran, closed it, placed
it in its white covering, and set it on his cell ledge. Then he
stood up and took off his orange shirt. He was thin but had a
wiry build with sharp muscle definition. We later learned that
he'd been a kickboxer at home. The guard commander offered

a wrinkled shirt had been tasked with monitoring the detainee. When he heard me, he looked horrified. I could see he was blaming himself for the carnage, and I walked over to him.

"This wasn't your fault," I said.

"But I heard what you just said," he replied in a pained voice.

I tried to convince him that the detainee meant "oppressors" writ large, the American infidels, not the guy standing outside his stall, but the kid looked dubious. Green as the grass that was so scarce inside the wire, he had only been at Guantánamo a couple of months. No doubt his day-to-day encounters with the captives were hard enough for him to process, let alone an event like this.

Halim survived, remarkably, and I learned more of his troubled story after the incident. He had arrived within weeks of the opening of Camp X-ray, so had been in detention for almost a year. He'd attended college in Indiana and he spoke English, but he'd barely talked when he first arrived in Gitmo, according to Vanessa, who had met him at X-ray. He always had a dazed look, as if he didn't know where he was. She wondered if he had gone through something terrible at Bagram. Eventually the camp psychologist put the Bahraini on some heavy meds, which gave him his first opportunity to try to kill himself. Halim would fake taking his medication each day and hide the pills in his cell, planning to store up enough so he could take them all at once and end his life. But one of his cellmates ratted him out, and the MPs introduced him to the IRF.

The IRF process was a little more ad hoc then, Vanessa

explained. Getting IRFed at X-ray meant receiving a good old-fashioned ass whipping, after which the lucky detainee would be hogtied—made to kneel with his hands behind his back and his hand and foot shackles locked together—for four hours. Apparently the Red Cross had complained about this to the highest levels of the military command.

Halim didn't speak in the following weeks. He just stared straight ahead. But the day that the MPs were transferring detainees from X-ray to the newly built Camp Delta, Halim received another beating. Vanessa saw him two days after the move and noticed that his face was black and blue. A psych tech told her that he was vastly better than he had been two days earlier. Vanessa tried to investigate why Halim was IRFed the day of the move, but her questions went unanswered. She learned only that there had not been a linguist present and that the MPs had somehow lost the videotape of that particular IRF action.

Soon after Halim got to Camp Delta, he tried another way to end his life. He thought he could scrape enough paint off the cells to eat all at once and do himself in, but it only gave him an upset stomach. Then for a while it appeared that he was starting to make some improvement—until the day he requested a razor in the shower, supposedly to shave his body hair. It seemed insane to me that a detainee who had twice previously tried to kill himself would be allowed to take a razor into the shower. But at this point, things not making sense at the camp was starting to become the norm.

Throughout that day, I found myself more numb than upset about the incident. I was mostly baffled that some MP,